oral argument. They are in Appeals No. 06-3069, Kitts v. Department of Transportation, and in Appeal No. 06-3157, ALEC v. United States Postal Service. Two preliminary matters before we begin the four-case argument calendar. First of all, we welcome, of course, everyone to our courtroom, but particularly a group of approximately 40 visitors who are here from Taiwan, I understand, so a particular welcome to them. The second piece of preliminary business is an admission to the bar of the Court of Appeals for the Federal Circuit, and actually I'm going to be the one making the motion on behalf of two of my law clerks, and therefore I will request that Judge Rader, as the senior most remaining judge, preside. I'll listen carefully and make sure the motion is in order. Thank you. May it please the Court. I move the admission of Jill Ho, who is a member of the bar in good standing of the highest court of the State of California, and of Lindsay Androsky Kelly, who is a member of the bar in good standing of the highest court of the State of New York. I have personal knowledge of their credentials. They have worked for me in each case for upwards of a year. I'm also quite aware of their not only technical legal skills, but their diligence and their character, and I certify to the Court that I am fully satisfied that they possess all the necessary qualifications for admission to the bar of this court, and in fact I have been so impressed with their performance that I'm recommending both of them to become clerks at the Supreme Court of the United States. I ask that my motion be granted. Do you want to ask any questions, Judge Shaw? No, I just hardly support the motion. In that case, it's joyfully granted. All right. Step to the clerk's desk, please. Please raise your right hand. Do you solemnly swear or affirm that you will report yourself as an attorney and consular of this court, outrightly and according to law, and that you will support the Constitution of the United States of America? I do. The ceremony that has just concluded was also witnessed by a number of special guests, including parents and other special people to the two law clerks, so a special welcome also to those visitors. On the oral argument calendar, the first argument is in Appeal Number 05-3213, Granier v. Department of Justice. Mr. Noon, welcome. Good morning. Please proceed. This is an appeal of the American Citizens Protection Board Final Decision of April 19, 2005. This is a whistleblower appeal. Why would it even qualify as whistleblowing to make a disclosure of office problems to your supervisor's supervisor when the person whose conduct was of concern was the immediate supervisor? Why wouldn't that be within the expected normal duties of a government employee of any agency, and particularly, in this case, Drug Enforcement Administration? Well, Your Honor, I don't believe that these were just made to their immediate supervisors or the disclosures were made to the second hand. Well, they didn't write to the New York Times or run up to Congress or go to some outside agency. They went up the chain of command. Why wouldn't that be within the normal course of their duties? Well, one, they're drug enforcement agents, and their normal duties are to fight crimes, deal with drugs, not to report. Well, when there's a management review of the office or there's an inspection initiated from higher levels, wouldn't it be the duty of every employee of that office to cooperate with the people conducting the management discussion or the inspection? Certainly, they have an obligation to cooperate, but it was their disclosures in the first place that necessitated this management review. They prompted this management review by their disclosures, so it wasn't within normal routine supervisor asking questions. Their disclosures repeatedly to second level supervisors, third level supervisors prompted them to say— Are you familiar with the Huffman case? And now Your Honor. Well, that's a case which, if I am correct in my recollection, holds that when one makes a disclosure up the chain of command of problems that merit higher level attention, that that doesn't count as a disclosure under the Whistleblower Protection Act on the theory that it's part of the job of every employee to do that. They went beyond their first level supervisor, the guy they were complaining about. I understand that, but the Huffman case makes the distinction about going up the chain of command versus going outside. But you're not familiar with the case, so I guess you can't— I'm not, but I understand the argument, Your Honor, but I believe that their disclosures went beyond that. They weren't just part of their routine duties, part of their routine obligations. Also, their disclosures made it all the way through various levels. This management review that brought up the report that chastised these individuals made its way to headquarters outside of the normal chain of command. It made its way into the newspapers outside of the normal chain of command. So the agency certainly manifested a unified institutional reaction to their disclosures, and it wasn't just kept within the house of the New England field. Be that as it may, the administrative judge found and held that the reason for their transfer to the southwest border area in all three agents' cases was not any disclosures they made, but other factors, including the much greater need for agents on the border and the lesser need for agents in the New Bedford resident office. Now, why wouldn't it be entirely within appropriate practices as distinct from the prohibited personnel practice that the Whistleblower Act condemned to transfer people to an area of greater need? Well, certainly the agency had the right to do it. I'm not contesting that they didn't have the right to send them. The standard is not could they have reassigned these agents.  Sure, and the administrative judge found, yes, they would have for multiple different reasons, any one of which on its face looked more than sufficient and would be the opposite of a prohibited personnel practice, would be a good personnel practice. The judge also found that this assigned official would never have made his decision but for the recommendations of those below him. Those people below him who put these agents on his platter had the motive to retaliate. Their reason for reassigning them was retaliation. You can't segregate his mindset without saying that it's tainted by these retaliatory motives from below. But Mr. Noon, you say there was a motive to retaliate there. And this didn't seem to me, at least from looking at the record, to be the sort of case where somebody makes a whistleblowing disclosure and then that disclosure is embarrassing to people up the line and they choose to retaliate against this person. I mean, it seemed that everybody who was involved in the decision relating to the transfer agreed that Mr. Schaefer was a problematic supervisor in the New Bedford office and that he should, well, he resigned on his own or retired and was gone by the time all of this happened in 02. But it seemed to me that the AJ found that there was no real motive to retaliate. There was nothing embarrassing to the people who made the transfer decision. They said, you know, the agents have provided information that we knew for ourselves. This supervisor was a problem and, you know, there wasn't any embarrassment or motive for them to retaliate. I certainly agree that they should not have retaliated, but I certainly see there's mounds of evidence that they reacted as calling these people rebellious. The special agent Schaaf wrote a recommendation up the chain. But that's different from a motive to retaliate. Mr. Noonan, the administrative judge specifically found that Guevara viewed the reassignment actions as not as punitive. He testified that he saw the reassignments as an opportunity for the appellants because they'd obviously become complacent in New Bedford. And then he says, in sum, I find no motive to retaliate on the part of Guevara. He's the director of operations of DEA, the top man. He's the one who made the decision. No motive to retaliate. Okay, but I think you need to focus not just on this blindfolded deciding official who came to the scene after the fact. He's the deciding official. He's precisely the one we have to focus on. But I don't think you can ignore all the influences that led these agents to be placed on his table. This isn't a disciplinary case where the deciding official takes a fresh look at everything. But you're asking us to retry the case. We are reviewing a decision that's already been made, and it says, in sum, I find no motive to retaliate. Now, how do we overcome that specific finding? The recommendation to Mr. Guevara, which he specifically, the judge found, he specifically relied upon the September 26 recommendation. That recommendation said that these agents acted against DEA's interests when they sided with the Mass State Police against DEA's interests. That recommendation he relied upon, that motive that's contained within that recommendation certainly colored his whole decision. And whether he comes to this blindfolded or is willfully blind, the decision is still tainted, and you can't ignore it. There's an institutional decisive admission contained in all these documents that this is a – their actions were against DEA's interests. Now, the administrative law judge does a lengthy – the board does a lengthy decision here. The chief administrative judge, where is the error in this 43-page opinion? I think it analyzes each of the three factors. He cut corners. He legally cut corners in order to allow the agency to prove its case by clearing the case. What do you mean cut corners? That's a nice phrase. What are you actually saying? Where is the defect in the opinion? Well, let's look at the third factor, which is the similarly situated – how the agency treated similarly situated employees. There was absolutely no evidence of similarly situated employees who were treated the same way, and – I don't think your answer to me is any more responsive to the question asked than your answer to Judge Rader. Where in the opinion does the administrative judge – When he compares these – Cut corners, your phrase, and use some illegal process or method in reaching his findings. When he compared these three agents to managers, he cut corners. That's not similarly situated. Where in the opinion does he make this comparison? In his analysis – Compares them to Ford, right? Daniel Ford, is that who you're talking about? He doesn't compare them to Daniel Ford. He compares them to an ASAC – two ASACs in Iraq from Detroit and Houston. He says, well, there's some evidence that Cass and Yvette has done this before, and he's recommended reassignments of managers to headquarters. He somehow equates that managers, the treatment of managers, to these appellants. And he also says that ostensibly they were not whistleblowers. Well, ostensibly means precisely that there wasn't sufficient evidence that he could say these are comparison employees that he could fairly compare to these employees, these agents. I still don't understand what the shortcut or defect was. Well, if they're required to put on evidence that they've treated non-whistleblowers in a similar fashion, they didn't do it. And he cut a corner by comparing them to people that they're not similarly situated to. So that's one corner. The other corner, on the motivation of the deciding official, by strictly focusing on him and ignoring all of the influences that led to him getting this decision, I believe that skirts the real standard. There didn't seem to be any evidence of anyone here who was trying to protect Mr. Schaefer or who was beholden to Mr. Schaefer. I mean, everyone seems – that's the point I was trying to make earlier. Maybe I'm wrong, but everybody seemed to agree that Mr. Schaefer was a problem. And nobody – I don't think anybody – there's anything in the record suggesting that your client's assessment of Mr. Schaefer was disagreed with by anybody. They all agreed, yeah, Schaefer's a problem. I mean, in other words, so there was no motive to retaliate against him for that. But their words speak volumes of their motive. The manager who conducted the management review called them hurtful. He suggested that they were disloyal. The Sack Trouble called them rebellious. But that may be – that's an assessment, and it may or may not be correct. But it's true. But it doesn't – he goes in there. You're talking about Benson? Benson goes in there. Yeah, he goes in there and he makes an assessment, and that's his evaluation. One can quarrel with it, but that doesn't suggest retaliation. He may be right, he may be wrong, but it doesn't suggest retaliation on its face. Well, he also recommended systematic cross-employment transfers of these guys. Well, that's maybe his – maybe that's his assessment. That's his conclusion as to what should be done. But again, that doesn't say on its face – that doesn't evidence retaliation. Well, this was a manager that DEA, for some reason – and the judge pointed this out in his initial stay decision – that somehow DEA is obsessed with this notion of protecting an individual who was by all accounts a lunatic. And – But they weren't – everyone seemed in the record to agree that he was a problem. You're talking about Schaeffer. Schaeffer. Yeah. But they let him in place. They allowed him to stay in place. They allowed him to go off and retire. And what they did was they said, these guys are acting against DEA's interests, these guys are rebelling, these guys are hurtful. So that's how they reacted. Whether this guy should have been protected, certainly shouldn't have been protected. But DEA's mindset was, you don't dare speak out against managers. And if you do, you're hurtful, you're rebellious, and you need to be shipped to the board. Let me ask you a different question. I don't understand what relief that you can be requesting, particularly on behalf of the two agents who went to the southwest border pursuant to these reassignments that you're complaining of. What's the relief you're asking for? I couldn't find it in the blue brief. Well, I certainly want the decision to be reversed and these individuals to be returned to their New England field division. Cancel the reassignment action. What authority do we have to arrange the deployment of the investigative force of DEA? That's a management decision for the agency. We would have no way of knowing how much they're needed in New Bedford versus Albany, New York versus Albuquerque, New Mexico. How can we possibly make a decision of that sort? You cannot allow an illegal action. The Whistleblower Protection Act protects against retaliatory actions such as this. If I understand what the act does, I'm asking you how you can justify the relief you're requesting with some kind of authority. What case holds that we could order somebody transferred back? I think you have the right to cancel the original reassignment and overrule this administrative law judge and say that, no, those reassignments were retaliatory and, no, they would never have happened absent the whistleblower retaliation. We can't rule that these two men have a permanent right to stay in New Bedford, Massachusetts the rest of their careers. The DEA could turn around and reassign them to the southwest border a month later if we ordered them sent back. I understand that. The day after you return them to work, if that's what happens, DEA can take the same retaliatory action. That's a whole new battle. But you do have the authority to cancel that reassignment. Now, what about the third man? As I understand it, he's not even in DEA anymore. You want him sent back to New Bedford, too? No, no. I certainly wish that we could turn back the clock and correct Judge Carroll's decision. Well, what relief are you asking for with respect to that agent? Well, he's here in the courtroom today. He certainly has a vested interest in this case. Well, what relief are you asking us to afford in the case of the man who's no longer an employee of DEA? Well, consequential damages, Your Honor. That's just a word. Well, he sold his house. He lost money on his houses. He had to move out to California. He had to move back because his family situation required him to be back home. So there were losses that he suffered along the way because of this retaliatory decision. You have the authority to make him whole. I'm not saying it's consequential damages. For real estate sale losses? Sure. Do you have some case that holds that we can order as corrective action real estate sale losses where people move? I believe you do, Your Honor. I don't have it off the top of my head. I'm not asking what you believe. I'm asking what case you can cite that holds that we have such authority. I don't have one off the top of my head, Your Honor. But I do know that you have the authority to grant consequential damages. All right. Well, let's hear from the government. Mr. Major? Good morning. Good morning, Your Honor. Am I pronouncing your name correctly? Yes, you are. Very well. Thank you very much. Please proceed. May it please the court, I'm going to pick up where the line of questioning last left off with regards to whether Mr. Grenier's petition before this court is moved. I wanted to refer the court to the Bohack case, which is cited in the brief. Did you file a motion for the case as to Grenier to be dismissed for lack of jurisdiction on grounds of mootness? It's included in our brief, Your Honor, responding to the petitioner's initial arguments. And the petitioner responded to it in their reply brief. I think the answer is no. The question was whether you filed a motion. The answer is no. And then you're saying, but maybe we don't have to since we mentioned it in our red brief. Your Honor, we tried to include the motion within our red brief rather than file a separate motion, which this court would have to dispose of in the middle of the briefing schedule. In particular, the case which the petitioner cited in defense of recovery of consequential damages, Bohack, actually is a case which limits the recovery of consequential damages. And notes that under the Whistleblower Protection Act, you can only recover those consequential damages which are akin to those listed in the statute, such as back pay, unreimbursed moving expenses, or attorney's fees. The record doesn't show any list of any particular damages that are akin to those damages. And the petitioners have not provided any sort of listing of those damages. In fact— Was there any testimony or documentation submitted to the administrative judge concerning these alleged consequential damages?  Well, is your position that there would be a waiver then? Or what are you really saying? Well, they wouldn't be entitled to recover consequential damages if they didn't bring them before the board. Well, I suppose their argument would be— Just a minute. There wouldn't be an evidentiary hearing at which testimony or other evidence relating to these supposed consequential damages could be adduced. What would be wrong with that? Well, there wouldn't be anything wrong with that on one level except for the fact—one, assuming that's the case. Two, assuming that they had brought something before this court in response—other than the counsel's assertion that they suffered consequential damages. And, in fact, counsel has asserted that those damages were real estate-type damages that Mr. Grenier suffered, the kind of damages that are not recoverable. How do we know that real estate sales-related monetary losses are not recoverable as consequential damages in this kind of a whistleblower case? Well, I think just looking at the Bohack case in the case law becomes quite clear that that's not the kind of consequential damages that— But Bohack doesn't hold that real estate damages are not recoverable. No, no. It does the opposite. It lists the kinds of things that are recoverable. Exactly. So your argument is that because the Bohack list didn't include real estate damages, that therefore one should assume that they're not recoverable. No, because the type of real estate damages that are sought are not akin to those listed in the statute, which is what Bohack holds. So that would be our argument. Also, with regards to the attorney's fees issues, of course, this court held in cognation that attorney's fees are not enough to sustain a case if the case is otherwise moved. What about as to the other two individuals? With regards to—well, we haven't argued that the case is moved with regards to either of the two individuals. Right. What do you have to say about the appeals with respect to those two? Well, the court very carefully analyzed the situation and did decide— The court? Or the board, excuse me, did decide after a number of factual findings that indeed the agency had demonstrated by clear and convincing evidence that these petitioners were assigned for reasons other than whistleblowing disclosures. It is notable that—and in response to some questions that were raised before, the board did not actually determine that they had made protective disclosures. It had skipped over that step. And so to the extent— But you didn't argue in your brief that there were no protective disclosures, did you? No, but the court— Well, if you didn't argue that in your brief, why should we allow you now to raise it in oral argument? Because then Mr. Noon has not had fair warning that he has to be prepared to meet those kind of arguments. Your Honor, my point is I don't think Mr. Noon needs to respond to that. I think in the case the court decides— Well, he might disagree with you. In the case that the court decides— He might say he needs to be able to respond to any position the government takes. You're the adverse party in the litigation. Well, our position is to the extent the court finds that the decision or the case is not supported by substantial evidence, the board's decision not supported by substantial evidence, because protective disclosures was not included within the scope of the decision, the case would need to be remanded back to the board. There Mr. Noon, of course, would make his argument that there were indeed protective disclosures and the government would argue to the contrary. Are you saying that the administrative judge acted improperly against the law in assuming, I'll call it, that the disclosures in question were protected under the statute and then going on to the causation issue? Is that impermissible for the administrative judge to do? Now, as we cite two cases in our brief, this court has specifically allowed the board to take things— So then the only question is whether the decision that the transfers would have been made even in the absence of the whistleblowing was well supported or not. That's correct, John. Did you understand Mr. Noon to be saying that there was less than substantial evidence? I didn't hear him use that phrase. I'm not quite sure whether he's— He seemed to be concerned about what he called corner cutting or things that weren't discussed by the administrative judge, but I didn't hear him say that on the totality of the evidence there was evidence not amounting to the fairly minimal standard of substantial that could be viewed as supporting the ultimate decision. I'm not sure that's what has been mentioned here today at oral argument now. I think he did focus on corner cutting or alleged corner cutting by the board, and I think it's very hard in light of the face of the decision to call it anything the board did. It's corner cutting of the board. I think it's the longest board opinion I've seen in 18 years on this court, and it's also one of the better written. I would say it's—on the whole, it's extremely well written, very detailed, very well organized, very careful. That doesn't mean it can't have error in it, but it certainly doesn't have the slightest hint of being a rush job or too cursory or lacking in detail or anything of that sort. That's correct, Your Honor. Even after finding, for example, that the decision makers did not possess any actual knowledge of the whistleblowing disclosures, the board, applying a clear and convincing standard, wasn't content to simply rest upon that. It went even further, looking to see if there was any possible taint coming up from the inspection, looking careful over the timelines, the testimony, and all evidence that it had received in the substantial record that was before the board. Do you understand, Mr. Noon, to be arguing that if some lower official did have an animus against these three agents, that that would taint the decision of the decision maker, even if that latter official didn't have any animus and didn't know of the animus of the lower level officials? I'm not quite sure if he's arguing that. I do think that— Well, suppose he is. If he is arguing that, what's your response? Well, my response is that you actually do need to look at the decision maker and— Only? Well, you need to look at the decision maker and clear and convincing it is appropriate for the board to look beyond the decision maker to some extent. In this case, the board looked very carefully beyond the decision maker. It looked upon who it received the recommendation for reassignment from. Mr. Major, the administrative law judge decides ultimately that these transfers would have taken place even without the disclosures. That's an argument that the government can always make. We transferred them. There were other reasons besides the disclosures. How does this court, or the board for that matter, decide which is the predominant reason or a motivating factor in the decision? Well, in this case, it—well, actually, this court wouldn't decide it, but the board would decide it by looking at the record, listening to the testimony. In this case, it heard the testimony of the deciding official, found him highly credible. It heard the testimony of the inspector who had recommended reassignment to him, found his testimony credible. That's Deering? No, I was talking about Cazenabet, who was the inspector who had recommended to Guevara the reassignment. It also did hear from Deering and found Deering credible. And it looked at basically everyone up and down the line to find out who knew what when before determining if there was any taint. But the agency takes almost no action regarding the deficiencies of Schaeffer except transferring these three employees who complained. Which is a consistent action to the extent that Schaeffer had retired after the inspection. Yeah, they let him run out at the end of his tenure, and maybe that's a reasonable sort of decision to make. But with so much acknowledged deficiency in his performance, why is there no action taken at all except these employees being transferred? Well, first, Your Honor— Doesn't that raise a question at least about the motivating factor for their transfer? No, actually, I think it would support some of the arguments that were made below. Schaeffer was not there during the inspection, and the inspection and the report that Guevara ultimately received on that inspection is how he made his decision. He wasn't aware at the time and testified credibly, as the judge found, that he was not aware of the situation with Rack Schaeffer. And, in fact, if he had been aware, he most definitely would have recommended something be done. At no point did Mr. Guevara believe, obviously, that Rack Schaeffer was a good administrator. When you say Rack Schaeffer, you mean resident agent in charge? That's correct, Your Honor. Surnamed Schaeffer? Yes, that's correct, Your Honor. Not everybody would know what a Rack is. We said, you know, Rack Raider. It's not necessarily clear what that means. If it was a Judge Raider, we'd know what it means. My apologies, Your Honor. But they definitely looked at Mr. Schaeffer as being culpable. However, he wasn't, as the testimony showed, in play at the time of the inspection. The inspectors didn't view him as in play. Would you agree that the transfers could be characterized as at least in part punitive and in reaction to perceived poor performance by these three agents? No. And I don't think that Mr. Guevara qualified them as punitive. Now, it is a fine line. Well, I'm not asking if Mr. Guevara used that word. I'm asking if a fair reading of the record wouldn't suggest that they were transferred at least in part because they were thought to have been agents with poor attitudes and poor behaviors in certain respects that were detailed in the two reports we've referred to, the management report and the inspection report. Well, they were transferred because of deficiencies, but that's a matter of maximizing resources rather than simply taking a punitive action. Sometimes the deed—I'm sorry. Well, this case is unlike other cases. In this case, the AJ found that these protected disclosures were a contributing factor, and the burden shifted to the government to show that they would have taken the action anyway. And so we do have—and the cases that you've been talking to us about are instances where the constructive knowledge was a question of the appellant coming forth to make a showing on its burden of proof. Here the government has the burden of proof. They have to show we would have taken this action anyway because these protected disclosures did contribute to what happened. I'm wondering if the one error we might perceive is that the burden was on the government, but it still seems that the appellant had to make the showing. Was the burden properly assigned in this case? No, the burden was properly assigned, Your Honor. That's part of the reason why the judge was so thorough and strict in his findings and did not let the government off the hook at any point during the hearings. He basically looked at each particular factor very thoroughly, very careful, and didn't simply dismiss matters out of hand. If the government argued that it had a strong reason because the decision maker had no actual knowledge, he looked into constructive knowledge. He looked into the possibility of taint. When the government argued with regards to whether or not individuals were similarly situated, he carefully actually winnowed down the evidence, not considering a lot of the evidence that was presented before him in order to try to make certain that he was following the most narrow point of view. Don't we have kind of a mishmash of motives here? On the one hand, they're being sent to the border because they're viewed as being poor agents who've gotten lazy or sloppy or something of the sort. On the other hand, we're told it's actually good for them because it's going to be rehabilitative. On the other hand, we're told that regardless of their potential or need for rehabilitation or their past conduct, they're needed at the border anyway because there are so many problems at the southwest border. We get a melange here. We get a big mixed stew here of supposed goals of the agency. How can we possibly disentangle that mix and mishmash and say, well, it's clear that the only operative reason was they needed more people at the border so we don't need to worry about all these other motives? Your Honor, I'm over my time. May I? Yes, you may. You better. In general, it isn't so much a mishmash of motives as a fine line. If you have an asset and the DA viewed these agents as assets, senior agents who were, as they specifically stated, that two or three years from now they would be supervisors. These were the kind of individuals they had. They were in an office where it was clear their performance was somewhat lackluster. My question is how can we disentangle these different motives? And you're just repeating what all the motives were. That doesn't respond to the disentangling problem. Well, the point is that— Judge Rader has a very strong point. This is a very complex and very unusual series of forces and motives. I don't know another case like it. It's your point, Mr. Major, they don't need to disentangle so long as there's no retaliation. That would be correct, Your Honor. And our point is that in the government's view this isn't a disentanglement. It is a question of how the management— But the test is would it have happened anyway? If none of these other facts had occurred, would the transfer have happened anyway? I don't see how we can answer that question without disentangling the different motives, but maybe there's a way. All right, I think we have your case clearly in mind, Mr. Major. Thank you, Mr. Noon. You used all your rebuttal time, but we'll give you back a minute and a half if you need it. Thank you, Your Honor. Just to touch on a couple of points, back to the cutting of corners. The judge completely ignored evidence of pretext in this case. That needs a border rationale, that was never raised in the recommendation. It was never raised in the justification written after these appellants had filed their OSC complaints. It wasn't raised until the first hearing.  The two witnesses testified that the headquarters inspectors knew everything that was going on in this office before the inspection ever took place. That was never addressed by the judge. Linda Sutton said that a senior person on the inspection team said these agents need to be moved. He said that before the inspection ever took place. In fact, this judge did shift the burden in his statement. The fact that the agents, in somebody's opinion, needed to be moved doesn't prove that the reason they were moved was whistleblowing. The testimony was that they signed with the Mass State Police, they'd forgotten who they were for, and they need to be moved. That certainly ties them to the idea of moving to their whistleblowing. But why would that maybe not be perhaps a valid reason? I mean, the problem is I couldn't see in the record any evidence of anybody's hostility to these agents. I mean, there were some assessments of the agents that one may or may not agree with. But in terms of the sort of hostility that we see that usually forms the basis for a retaliation claim, I didn't see any of that. The SAC trooper said to them, I'll transfer you as fast as the border. You've been disloyal. I'll transfer you to the border. Well, maybe that's a good reason. I don't know. Because they've been disloyal, because they spoke out against their boss. Again, it was a reaction to their speaking out. I don't see how you're jumping the fences here. If they were viewed as having an improper attitude with respect to the Massachusetts State Police, that doesn't seem to involve the whistleblowing issue. That involves some sort of issue of attitude or relationships with other law enforcement agencies. If the view was that their interaction with the Massachusetts State Police was inappropriate, as Judge Schall suggests, that might be a very good reason for a punitive transfer, which would have nothing to do with the whistleblowing. They weren't whistleblowing about the Massachusetts State Police. They were whistleblowing, if at all, about Mr. Schaffer. The whole idea was the Massachusetts State Police, three lieutenants from the State Police, blew the whistle about Schaffer, as did these appellants. What the management review talked about was that these guys actually dared to voice the same disagreements with their boss as the three lieutenants from the State Police. All right. I think we have both sides' cases clearly in mind. All time has expired. We thank both counsel. We'll take the appeal under advisement.